UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MUSHEN A. HASSAN,

        Plaintiff/Petitioner,

v.

MICK DEDVUKAJ, DETROIT DIRECTOR
FOR CITIZENSHIP AND IMMIGRATION
SERVICES, ET AL.,

        Defendants/Respondents.

Case No. 09-10716

Honorable Nancy G. Edmunds

_____/

**OPINION AND ORDER DENYING DEFENDANTS' MOTION FOR SUMMARY
JUDGMENT [12]**

Mushen A. Hassan ("Petitioner") has filed a Petition for review of denial of

naturalization against Mick Dedvukaj, Detroit Director for Citizenship and Immigration

Services ("CIS"); Terrence Berg, United States Attorney for the Eastern District of Michigan;

Janet Napolitano, Secretary for the Department of Homeland Security; and Eric Holder,

United States Attorney General ("Defendants").   This matter is before the Court on

Defendants' motion for summary judgment arguing that Petitioner is not entitled to an

exemption from the English, history and civics requirements for naturalization based on a

developmental disability of mild mental retardation.   *See* 8 U.S.C. § 1423(b)(1); 8 C.F.R.

§§ 312.1(b)(3), 312.2(b)(1).  Defendants also argue that, even if Petitioner had established

that he was entitled to an exemption, he cannot show an attachment to the Constitution and

has not requested a waiver from the Attorney General and thus cannot become a

naturalized citizen.  Because genuine issues of material fact exist, this Court DENIES Defendants' motion for summary judgment.

## I.    Facts

Petitioner was born in Yemen on May 10, 1972 (making him 37 years old), and became a legal permanent resident of the United States on September 22, 1992.  During the past 17 years, he has resided continuously in the United States, has been a law abiding citizen, and has paid his taxes.

On November 29, 2006, Petitioner's counsel mailed to the CIS his N-400  application for naturalization along with (1) a Form N-648, Medical Certification for Disability Exception, signed by Dr. Firoza Van Horn on January 31, 2006 and certifying that Petitioner suffers from mild mental retardation, DSM-IV Code 317.00; and (2) a letter from Dr. Van Horn stating that she had met Petitioner on three separate dates in June and July of 2006, that he suffers from mental retardation, and this renders him unable to take an English test. (Pet.'s Ex. 1, 11/29/06 letter; Ex. 2, Form N-648 dated 1/31/06; Ex. 4, 8/30/06 letter.)  Dr. Van Horn is a licensed clinical psychologist who specializes in both forensic and neuropsychology.  (Pet.'s Ex. 3, Curriculum Vita of Dr. Van Horn.)

On May 1, 2007, Petitioner appeared with counsel and a translator for his naturalization interview before Immigration Officer Karyn Morton.  The Immigration Officer rescheduled the interview to July 11, 2007.  Her Form N-652, Naturalization Interview Results, states that (1) a decision could not yet be made on Petitioner's application, (2) re-examination was scheduled for July 11, 2007, and (3) Dr. Van Horn should provide a supplemented Form N-648 that (a) provides a diagnosis and date of diagnosis of all impairments, (b) explains in detail how Petitioner's "medical conditions impair his ability to

2

learn or demonstrate knowledge of English and U.S. History and government," along with a "the clinical reasons why the applicant is unable to learn English, in basic terminology, based on your examination of the applicant," and  (c) includes the tests or treatments provided to the applicant."  (Defs.' Ex. A.3, Form N-652.)

On July 11, 2007, Petitioner returned for the re-scheduled interview before Immigration Officer Karyn Morton.  He brought along a July 10, 2007 supplemental Form N-648 completed by Dr. Van Horn that addressed the Immigration Officer's concerns. (Pet.'s Ex. 9, 7/10/07 Form N-648.)   In that supplemental Form N-648, Dr. Van Horn reiterated the diagnosis of mild mental retardation and provided the Diagnostic and Statistical Manual of Mental Disorders Edition IV ("DSM-IV") code of 317.00 for that diagnosis.  Dr. Van Horn explained that:

> Mental Retardation is associated with a large number of conditions.  It could be due to polygenic inheritance, environmental risks, genetic problems, health-related problems and developmental disorders.  People affected with mental retardation as in the case of Mr. Hassan, [sic] he cannot improve in his intellectual domains above a 2nd grade level.  Adaptive functioning is also well below his age level depending on the environment where he lives.  He will never be proficient in the English language.

(*Id.*)  She also described Petitioner's impairments as follows:

> Mr. Hassan is a 34 year old male who was born in Yemen.  He came to the United States in 1992.  He has no formal education.  He can speak Arabic with a poor vocabulary.  He cannot read or write Arabic.  He does not speak or understand English.  He works at a restaurant as a manual laborer but under the supervision of his brother who is an employee there also.  He cannot remember instructions and has to engage in tasks that are routine.  He does not know the alphabet, his shapes and numbers.  He operates via pictures and colors.  He cannot do any cooking because he forgets to turn the stove off or he burns the food.  He is unable to organize his day and has to be reminded what to do.  He can take care of his grooming and hygiene.

3

(*Id.*)  Dr. Van Horn determined that Petitioner suffered from developmental mental retardation, described the clinical tests she administered and their results, and explained in detail the connection between Petitioner's mild mental retardation and his inability to learn English, U.S. history, and civics.

> Mr. Hassan suffers from developmental mental retardation and has been slow all of his life.  His adaptive skills, in that his ability to make decisions, use basic judgment, live independently, pay bills and so on are very impaired.  He is unable to dial a phone number because he does not remember the sequence unless it is written for him in Arabic.  He can only count to number 10 in Arabic. He was administered a Wechsler Adult Intelligence Test-III and the pattern of his results is a characteristic picture of organic brain damage of longstanding with Performance in the markedly defective IQ range (52).  This pattern of deficits is suggestive of central nervous system pathology.   He shows extreme concreteness of thinking.  Memory is extensively impaired even when he was queried about information regarding history of Yemen.  He clearly indicated a primitive quality of his thinking.  When given a test of Similarities, which is a measure of abstract thinking as for example the similarities between an apple and a banana and it is explained to him in great detail, he was unable to make a connection, even when they were translated to him in Arabic.  On the Bender Gestalt Visual Motor Test, he indicated significant impairment in visual-motor coordination.   His responses were all primitive and consistent with mental retardation of an organic nature.  His performance is roughly equivalent to an individual around the age of 6 years and 11 months.  Overall, his performance indicates consistent and significant delays across all areas of cognitive, language and visual-motor functioning.  He indicates significant delays in mastering of basic concepts such as numbers, letters, colors, shapes, sizes and direction and position as indicated with the Bracken Basic Concept skills-Revised.  He will tend to have attention problems across different settings.   Social skills are very impaired.  His repertoire of adaptive skills are commensurate with his cognitive development.
>
> Mr. Hassan was assessed in the context of his intellectual capacities to assess whether this man can learn basic English and remember enough information to take a test in Civics.  Based on the test results, education and work history, he is incapable of learning basic information when he cannot even recite or identify the alphabet in English because his deficits are across multiple domains which makes it difficult for him to learn, retain, differentiate, organize his thinking to apply it to any type of learning or writing materials.

4

(*Id.* (emphasis added).)  Dr. Van Horn certified that it was her professional opinion that Petitioner's mild mental retardation affected his functioning to such a degree that he was unable to learn and/or demonstrate an ability to speak, read, or write English and was unable to learn and/or demonstrate knowledge of U.S. history and civics even in a language that he understands.  (*Id.* at 2.)

At the July 11, 2007 interview, Immigration Officer Morton took a statement under oath from Petitioner.  In that statement, Petitioner indicated that (1) he had obtained a Michigan driver's license by having someone else read the test questions to him in Arabic; (2) he worked as a prep cook under his brother's supervision and direction; (3) he could not learn English; and (4) a doctor had told him that he was able to follow directions but unable to think on his own.  (Pet.'s Ex. 5, 7/11/07 Record of Sworn Stmt.)

On September 20, 2007, U.S. CIS Field Office Director for Detroit, Jack Lin, sent Petitioner a written decision denying his application for naturalization because "[t]he medical waiver claimed mild mental retardation as the basis for the waiver request, however, no evidence of this disorder being diagnosed during the applicant's developmental years, as is required for a diagnosis of mental retardation, was provided on the record."  (Defs.' Ex. A.5, 9/20/07 Denial Decision at 3 (emphasis added).)

On or about October 23, 2007, Petitioner appealed the denial by filing a N-336 Request for a Hearing on a Decision in Naturalization Proceeding.  Along with the Form N-366, Petitioner filed certain exhibits, including a letter from his employer at Olympia Restaurant, and official reports on the widespread poverty and unavailability of medical care, specifically mental health care, in the Republic of Yemen.  (Pet.'s Exs. 6-8.)  Other than the testing performed by Dr. Van Horn and the background information provided by

his brother to Dr. Van Horn, Petitioner had no medical records to indicate that he suffered from developmental retardation. Petitioner requested an administrative hearing to appeal the denial of his naturalization application.

On May 8, 2008, Petitioner appeared at the administrative appeal hearing. (Pet.'s Ex. 8, 1/20/09 Order affirming denial of naturalization application.)

On January 26, 2009, the U.S. CIS sent Petitioner a copy of the Order affirming the earlier denial of his naturalization application because he failed to present (1) new medical evidence; (2) evidence of this disorder being diagnosed during his developmental years; and (3) medical records to confirm this diagnosis or evidence of tests completed to establish the diagnosis. (*Id.*) Moreover, on his signed Application for Immigrant Visa and Alien Registration, filed by Petitioner when he entered the United States, Petitioner attested that all statements in the Application were true, including that (1) he was not mentally retarded; (2) had no mental or physical defect, and (3) could read, write and speak the Arabic Language. It was found that these statements "contradict what was stated by the Doctor on the N-648 Medical Certification for Disability Exception." (*Id.*) The CIS further observed that "the Doctor who completed your Medical examination in Sanaa [Yemen] prior to your entrance in the United States stated that you had no <u>apparent</u> defect, disease or disability." (*Id.* (emphasis added).) Accordingly, the CIS "ORDERED that the decision to deny the application for naturalization will remain unchanged." (*Id.*; Defs.' Ex. A.6, 2/26/91 and 6/6/92 Med. Exam. Form completed by Pet.'s Doctor; Defs.' Ex. A.7, 3/17/91 Application signed by Pet.)

On February 25, 2009, Petitioner filed this action seeking review of the denial of his naturalization application. Petitioner alleges that (1) the CIS should have accepted his

6

supplemented Form N-648 Medical Certificate of Disability Exception and granted him a waiver; (2) the CIS erred in denying his application based upon inconsistencies in his Application for Immigrant Visa and Alien Registration because (a) it was written in English, a language he cannot read or speak,[1] and (b) he suffers from mild mental retardation, a condition that may not have been apparent to the examining physician; and (3) the CIS erred in refusing to provide Petitioner with a copy of documents the CIS relied upon to show inconsistencies between Dr. Van Horn's diagnosis in his Form N-648 Medical Certificate of Disability Exception and his earlier Application for Immigrant Visa and Alien Registration. (Pet.'s Compl. ¶¶ 18-21.)

This matter is now before the Court on Defendants' motion for summary judgment arguing that there are no genuine issues of material fact that Petitioner failed to submit forms sufficient to waive the requirement that he demonstrate a knowledge and/or understanding of English, U.S. history, and civics.

## II.   Standard of Review

### A. *De Novo* Review Under 8 U.S.C. § 1421(c)

Under 8 U.S.C. § 1421(c) and 8 C.F.R. § 336.9(b), a person whose application for naturalization is denied after a hearing before an immigration officer may seek review of the denial in the United States District Court for the district in which the person resides. Section 1421(c) provides that the Court's review "shall be de novo, and the court shall make its own findings of fact and conclusions of law and shall, at the request of the

---

[1]Petitioner's Application for Immigrant Visa and Alien Registration reports that he completed the application with the assistance of another person – H.A. Lugman – from the Republic of Yemen.  (Defs.' Ex. A.7, Application at 3.)

7

petitioner, conduct a hearing de novo on the application."  8 U.S.C. § 1421(c); *see also* 8 C.F.R. § 336.9(c) ("The review will be *de novo*, and the court will make its own findings of fact and conclusions of law.").

"This grant of authority is unusual in its scope – rarely does a district court review an agency decision de novo and make its own findings of fact."  *Nagahi v. INS*, 219 F.3d 1166, 1169 (10th Cir. 2000).  Accordingly, unlike the typical administrative review of an agency decision, the Court's review of the denial of a naturalization application is not deferential.  *See United States v. Hovsepian*, 359 F.3d 1144, 1162 (9th Cir. 2004) (en banc) (observing that "the district court has the final word and does not defer to any of the INS's findings or conclusions"); *Mobin v. Taylor*, 598 F. Supp.2d 777, 781 (E.D. Va. 2009) (observing that the district court's *de novo* review is " without *Chevron* deference afforded to the administrative findings of either the BIA or the BCIS.").  Moreover, this Court's review "is not limited to any administrative record," and its decision "may be on facts established in and found by the district court de novo."  *Aparicio v. Blakeway*, 302 F.3d 437, 445 (5th Cir. 2002).  Furthermore, it is proper to conduct this review within the context of a motion for summary judgment.  *See Chan v. Gantner*, 464 F.3d 289, 295-96 (2d Cir. 2006) (rejecting an argument that § 1421(c) "implies a bench trial or evidentiary hearing" and thus precludes motions for summary judgment as a vehicle to obtain review of a denial decision).

## B.  Summary Judgment Standard

Summary judgment is appropriate where "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  A moving party may meet that burden "by 'showing'-that is, pointing out to the district court-

8

that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett,* 477 U.S. 317, 325 (1986). When the moving party has met its burden under rule 56(c), "its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Industries Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Ultimately a district court must determine whether the record as a whole presents a genuine issue of material fact, *id.* at 587, drawing "all justifiable inferences in the light most favorable to the non-moving party," *Hager v. Pike County Bd. Of Education*, 286 F.3d 366, 370 (6th Cir. 2002).

## III.  Analysis

This Court's *de novo* review begins with the statutory framework for naturalization of permanent resident aliens like Petitioner.

### A.  Statutory Framework - Naturalization Applications

Since 2002, "[t]he Bureau of U.S. Citizenship and Immigration Services (CIS) handles applications for U.S. citizenship." *Chan v. Gantner*, 464 F.3d 289, 290 (2d Cir. 2006) (internal citation omitted). The naturalization application process was recently described as follows.

> After five years of continuous residence following lawful admission to permanent residence, an alien becomes eligible to apply for naturalization. 8 U.S.C. § 1427(a). A naturalization applicant must demonstrate, *inter alia*, good moral character; the ability to read, write and speak English; and a basic knowledge of United States history and government. *See* 8 U.S.C. § 1423(a), § 1427(a)(3). The applicant also has the burden of proving he was "lawfully admitted to the United States for permanent residence." 8 U.S.C. § 1429. Once the application has been filed, an INS officer interviews the applicant and makes a determination to either approve or deny the application. 8 U.S.C. § 1446. If the application is denied, the applicant can request a hearing before an immigration officer. 8 U.S.C. § 1447(a). This second hearing must be before an

officer of a higher grade level than the first.  8 C.F.R. § 336.2(b).  If the INS again denies the application, . . . , the applicant may seek review of the denial in the United States District Court.  8 U.S.C. § 1421(c).  Applicants may only appeal to the district court, however, if they either sought administrative review and the application was again denied, or if they sought administrative review and the review was delayed for more than 120 days.  *Id.* at § 1421(d).  Rather than conducting an administrative review, the district court reviews the case *de novo* and makes its own findings of fact and conclusions of law.  *Id.*

*Aparicio*, 302 F.3d at 440.

As stated above, to obtain naturalization, an applicant must "demonstrate an understanding of the English language, including an ability to read, write, and speak words in ordinary usage in the English language."  8 U.S.C. § 1423(a)(1); 8 C.F.R. § 312.1(a).  The naturalization applicant must also demonstrate a "knowledge and understanding of the fundamentals of the history, and of the principles and form of government, of the United States."  8 U.S.C. § 1423(a)(2); 8 C.F.R. § 312.2(a).  It is the applicant's burden to establish, by a preponderance of the evidence, that the requirements for naturalization have been met.  8 C.F.R. § 316.2(b).

Congress has provided exceptions to these English, history, and civics requirements.  Specifically, § 1423(b)(1) provides that these requirements "shall not apply to any person who is unable because of physical or developmental disability or mental impairment to comply therewith."  8 U.S.C. § 1423(b)(1).  To be eligible for an exception, an applicant must establish that he or she (1) "is unable, because of a medically determinable physical or mental impairment . . . which has lasted or is expected to last at least 12 months, to demonstrate an understanding of the English language," and (2) "is unable to demonstrate a knowledge and understanding of the fundamentals of the history, and of the principles

10

and form of government of the United States because of a medically determinable physical or mental impairment, that already has or is expected to last at least 12 months."  8 C.F.R. §§ 312.1(b)(3); § 312.2(b)(1).  The term "medically determinable" is defined as "an impairment that results from anatomical, physiological, or psychological abnormalities which can be shown by medically acceptable clinical or laboratory diagnostic techniques to have resulted in functioning so impaired as to render an individual unable to demonstrate" the understanding and knowledge required under the English language and history sections, "even with reasonable modifications."  *Id.* (emphasis added).

### B.  Review Guidelines for Applicant's Form N-648

A naturalization applicant seeks an exception by submitting a Form N-648, Medical Certification for Disability Exception, as an attachment to the applicant's Form N-400, Application for Naturalization.  8 C.F.R. § 312.2(b)(2).  Relevant here, the Form N-648 is "to be completed by . . . a clinical psychologist licensed to practice to practice psychology in the United States," and who is "experienced in diagnosing those with . . . mental medically determinable impairments and shall be able to attest to the origin, nature, and extent of the medical condition as it relates to the disability exceptions. . . ."  *Id.*  The Federal Regulations further provide that, if the CIS "has credible doubts about the veracity of a medical certification," it has "the right to refer the applicant to another authorized medical source for a supplemental disability determination."  *Id.*

On September 18, 2007, the CIS issued a memorandum revising the *Adjudicator's Field Manual* and clarifying the review standards under 8 C.F.R. § 312 when adjudicating Form N-648, Medical Certification for Disability Exceptions.  (Defs.' Ex. A1.)  That *Field*

*Manual* provides that "the adjudicator's role is to determine whether the Form N-648 contains sufficient information" to establish the naturalization applicant's eligibility for a disability exception.  (*Id.* at 2, ¶ 3.B.)  The adjudicator "must ensure" that the Form N-648 contains:

.  An explanation of the origin, nature, and extent of the medical condition which is established and documented by medically acceptable clinical or laboratory diagnostic techniques, including a list of the medically acceptable clinical or laboratory diagnostic tests used in diagnosing the condition.

.  An explanation of how the applicant's diagnosed medical condition or impairment so severely affects the applicant that it renders him/her unable to learn or demonstrate knowledge of English and/or United States history and government.

.  An attestation that the disability has lasted, or is expected to last, 12 months or longer; and

.  An attestation that the disability is not the direct effect of the illegal use of drugs.

(*Id.* at 6, ¶ (5)(D)(1).)

"[T]he adjudicator <u>should assume</u> that the medical professional's <u>diagnosis is valid in the absence of credible doubt</u>."  (*Id.* at 3, ¶ 3.D (emphasis added); *see also id.* at 6, ¶ (5)(D)(3).)  "[C]redible doubts may arise when the adjudicator establishes or has reason to believe that" the medical professional completing the Form N-648 is under investigation, has a pattern of submitting these Forms with "boiler plate" language, the Form was submitted more than six months after completed, the Form was completed by someone other than the certifying medical professional, evidence in the record or other credible

12

information indicates fraud or willful misrepresentation, the medical professional did not conduct a personal examination of the applicant, or the medical professional failed to conduct "specific medical, clinical, or laboratory diagnostic techniques that are considered standard methods in diagnosing the applicant's medical condition." (*Id.* at 7, ¶ (5)(D)(3).) The *Field Manual* further provides that, "[i]f the adjudicator finds or has reason to believe the medical determination is suspect . . ., the adjudicator may question the applicant," and the questioning "should focus on eliciting facts about the applicant's activities and conduct." (*Id.*)  If inconsistent with the applicant's diagnosis, "the adjudicator may have a justifiable basis for doubting the authenticity of the medical determination." (*Id.*)  The adjudicator may also request medical records or require a supplemental disability determination.  (*Id.*)

An adjudicator may issue a Form N-14 to address deficiencies in an applicant's Form N-648.  (*Id.* at 9, ¶ (5)(E)(5).)  "If the medical professional's assessment is unclear and/or if an applicant's request for a disability exception is otherwise deemed to be insufficient, that adjudicator <u>must request additional information to clarify the assessment and address any deficiencies</u>." (*Id.* at 9, ¶ (5)(E)(5)(b) (emphasis added).)  The agency has  "the right to refer the applicant to another authorized medical professional, at the applicant's expense," if there are "credible doubts about the veracity of the medical certification." (*Id.* at 9, ¶ (5)(E)(5)(c).)

Denial decisions "based in whole or in part on credible doubts about or the deficiencies of an N-648 must explain the reasons why the credible doubts and deficiencies are preponderant over favorable medical evidence submitted on behalf of the applicant.

Merely stating that the applicant has failed to meet the requirements for the waiver is insufficient." (*Id.* at 3, ¶ 3.F; at 10, ¶ (5)(E)(7).)

## C. Analysis of Defendants' Arguments

It is not disputed that Petitioner cannot satisfy the English, U.S. history, and civics requirements for naturalization. Rather, the core issue here is whether Petitioner's supplemented Form N-648 was sufficient to show that he was entitled to an exemption from those requirements because he suffers from a developmental disability of mild mental retardation. *See* 8 U.S.C. § 1423(b)(1); 8 C.F.R. §§ 312.1(b)(3), 312.2(b)(1). Defendants argue that (1) Petitioner's supplemented Form N-648 was insufficient; and (2) even if it was sufficient, Petitioner cannot demonstrate and communicate an attachment to the principles of the United States Constitution as is required to be a naturalized citizen. The Court first addresses the sufficiency of Petitioner's Form N-648.

### 1. Sufficiency of Petitioner's Supplemented Form N-648

Defendants argue that Petitioner cannot show that his supplemented Form N-648 is sufficient because Dr. Van Horn did not use medically acceptable clinical and laboratory diagnostic techniques and could not possibly attest to the origin or duration of Petitioner's alleged mild mental retardation because she (a) failed to use a proper interpreter; (b) failed to obtain Petitioner's medical records so as to substantiate her diagnosis, and (c) failed to limit or qualify her diagnosis in light of Petitioner's failure to complete many of the diagnostic tests and her lack of medical records to substantiate her diagnosis. Petitioner argues the opposite. The Court begins its analysis with an examination of the clinical and diagnostic tests as well as other materials Dr. Van Horn used to arrive at her diagnosis.

14

The Court will also consider the Guidelines set out in the CIS *Adjudicator's Field Manual* when determining whether Petitioner's Form N-658 contains sufficient information to establish Petitioner's eligibility for a disability exception.

### a.  Diagnostic Testing

In addition to obtaining a family history and general information from Petitioner's brother, Dr. Van Horn administered three reputable, standardized tests on Petitioner:  (1) Wechsler Adult Intelligence Test III, (2) the Bender Gestalt Visual Motor Test; and (3) the Bracken Basic Concept Skills test.  (Pet.'s Ex. 9, 7/10/07 Form N-648.)  Dr. Van Horn testified that other doctors would use these same three tests to diagnosis mental retardation.  (Defs.' Ex. C, Dr. Van Horn Dep. at 69.)  The Wechsler Adult Intelligence Test III was designed by Dr. Wechsler, a psychologist, as a tool to measure intelligence.  It was first published in 1997 and is generally recognized as the primary clinical instrument used to measure adult and adolescent intelligence.  Dr. Van Horn administered the part of the Wechsler Test that was non-verbal and did not require Petitioner to speak or write, and determined that he had an IQ of 52.  (Van Horn Dep. at 65-69.)

Dr. Van Horn also administered the Bender Gestalt Visual Motor Test, a psychological test used to evaluate "visual-motor maturity" and to screen for developmental disorders, and to assess neurological function or brain damage.  Dr. Van Horn reported that Petitioner had significant impairment in visual-motor coordination, that his responses were all primitive and consistent with mental retardation of an organic nature, and that his performance was equivalent to a child of 6 years, 11 months.  (Pet.'s Ex. 9, 7/10/07 Form N-648.)

15

Finally, Dr. Van Horn administered the Bracken Basic Concept Skills test; another psychological test designed to evaluate an individual's ability to conceptualize. She determined that Petitioner's performance indicated significant delays in mastering basic concepts such as numbers, shapes, letters, colors, sizes, direction, and position. He also tended to have attention problems and impaired social skills. (*Id.*)

It is not disputed that Petitioner's Form N-648 was completed by a licensed psychologist experienced in diagnosing an impairment like mental retardation. Thus, as provided in the September 18, 2007 *Adjudicator's Field Manual*, the CIS adjudicator is to ensure that the Form N-648 contains the following:

> . An explanation of the origin, nature, and extent of the medical condition which is established and documented by medically acceptable clinical or laboratory diagnostic techniques, including a list of the medically acceptable clinical or laboratory diagnostic tests used in diagnosing the condition.

> . An explanation of how the applicant's diagnosed medical condition or impairment so severely affects the applicant that it renders him/her unable to learn or demonstrate knowledge of English and/or United States history and government.

> . An attestation that the disability has lasted, or is expected to last, 12 months or longer; and

> . An attestation that the disability is not the direct effect of the illegal use of drugs.

(Defs.' Ex. A.1, 9/18/07 Field Manual at 5, ¶ (5)(D)(1).) Petitioner's Form N-648 complied with each of these requirements.

**b. Credible Doubts**

16

The September 18, 2007 *Adjudicator's Field Manual* further provides that, absent credible doubt, "the adjudicator <u>should assume</u> that the medical professional's <u>diagnosis is valid</u>." (Defs.' Ex. A.1, 9/18/07 Field Manual at 3, ¶ 3.D (emphasis added); *see also id.* at 6, ¶ (5)(D)(3).)  It reminds CIS adjudicators that they are not physicians and thus should not make medical determinations.  (*Id.* at ¶ (5)(D)(2).)  Accordingly, adjudicators are instructed not to (1) "[r]equire or recommend that an applicant complete specific medical, clinical, or laboratory diagnostic techniques, tests, or methods;" (2) "[d]evelop and substitute his or her own diagnosis of the applicant's medical condition in lieu of the medical professional's diagnosis;" or (3) [r]equest or require an applicant's medical records solely to question whether there was a proper basis for the medical professional's diagnosis." (*Id.*)

The core issue here is whether Defendants have established that "credible doubts" exist concerning the veracity of Petitioner's supplemented Form N-648.[2]  Absent "credible doubts," it should be assumed that Dr. Van Horn's diagnosis was valid.

The *Field Manual* provides that "credible doubts" may arise about the authenticity of the medical determination "when the adjudicator establishes or has reason to believe" one of the following:

> . The medical professional completing the Form N-648 is under investigation by FDNS, Immigration and Customs Enforcement, or other law enforcement agency, or a state medical board;

---

[2]Defendants' suggestion in a footnote that "credible doubts" arose because the Form N-648 was not submitted as an attachment to the Petitioner's Form N-400 is refuted by Petitioner (Ex. 1, 11/29/06 original cover letter) and not rebutted by Defendants.

17

.   The medical professional has a pattern of submitting Form N-648 with similar or "boiler plate" language that does not appear to reflect a case-specific analysis;

.   Form N-648 was submitted more than six (6) months after it was completed by the medical professional;

.   Form N-648 was completed by someone other than the certifying medical professional;

.   Evidence in the record or other credible information available to the adjudicator indicates fraud or willful misrepresentation;

.   The medical professional failed to conduct a personal examination of the applicant in the course of diagnosing the applicant's medical condition; or

.   The medical professional neglected to conduct specific medical, clinical, or laboratory diagnostic techniques that are considered standard methods in diagnosing the applicant's medical condition.

(*Id.* at 7, ¶ (5)(D)(3).)

Defendants' arguments here focus on this last ground for "credible doubts." They do not argue that Dr. Van Horn neglected to conduct specific clinical or diagnostic tests considered standard to arrive at her diagnosis. Rather, they argue that her failure to use a "proper" interpreter, rather than Petitioner's brother, when conducting her testing creates "credible doubts" about the veracity of the Form N-648 medical certification. Defendants further argue that, because Dr. Van Horn failed to obtain medical records from a family physician that occasionally treated Petitioner, credible doubts arise that render the Form N-658 insufficient to establish that Petitioner is entitled to an exemption from the English, U.S. history, and civic requirements for naturalization.

18

1.  **"Proper" Interpreter**

Neither the *Field Manual* nor the Federal Regulations address the use of an interpreter when medical, clinical, or laboratory diagnostic tests are administered in connection with determining an applicant's diagnosis.  Rather, Defendants turn to guidelines from the American Psychological Association, and argue that Dr. Van Horn's use of Petitioner's brother rather than an "unbiased" interpreter gives rise to "credible doubts" about the veracity of Dr. Van Horn's medical determination.  *See*, APA, *APA Guidelines for Providers of Psychological Services to Ethnic, Linguistic, and Culturally Diverse Populations*, at 4-5 (observing that psychologists should "offer the client a translator with cultural knowledge and an appropriate professional background;" or, if unavailable, "then a trained paraprofessional from the client's culture is used as a translator/culture broker."); *see also* APA, *Ethical Principles of Psychologists and Code of Conduct*, § 2.05 (observing that psychologists should "take reasonable steps" to "avoid delegating such work to persons" with relationships "that would likely lead to exploitation or loss of objectivity").

Despite Defendants claims to the contrary, Dr. Van Horn testified at her deposition that, although Petitioner's brother provided family history and information about Petitioner, a non-family translator, Abdul Nasser, was used during Petitioner's diagnostic testing.  Dr. Van Horn also testified that it is her standard practice to use a non-family member as a translator.  (Dr. Van Horn Dep. at 48-52, 55-58.)  Viewing this evidence in the light most favorable to Petitioner, Defendants have not established as a matter of law that the Petitioner's Form N-648 was insufficient thus justifying a denial of his naturalization application.

## 2.  Medical Records from Family Practitioner

Defendants further argue that Dr. Van Horn failed to use medically acceptable clinical or laboratory diagnostic techniques because she failed to obtain and substantiate her diagnosis with Petitioner's medical records.  Specifically, Defendants fault Dr. Van Horn for not obtaining the records of Petitioner's family doctor, Dr. Mousla, because his medical records might have stated that Petitioner was not retarded.  (Defs.' Mot. at 12.)  Defendants fail to establish that they are entitled to summary judgment for the following reasons.

First, Defendants ignore Dr. Van Horn's deposition testimony that she (1) had obtained a family history from Petitioner's brother, (2) was informed by Petitioner's attorney that there were no medical records concerning Petitioner's mental disability for her to review, (3) was informed that Petitioner did not have a history of mental illness or psychiatric care, (4) was informed that Petitioner had no school or medical records from Yemen, and (5) was informed that Petitioner did not have any major medical or psychiatric problems.  (Dr. Van Horn Dep. at 29-32, 35-39, 41.)  She explained that she did not obtain records from Petitioner's family doctor because that doctor's evaluation of Petitioner's occasional medical problems was unrelated to her evaluation of Petitioner's cognitive abilities.

> [M]y role is a psychologist and I was evaluating him for his cognitive problems. And Dr. Mousla is not a psychologist. He doesn't evaluate the person's cognitive problems.  He evaluate[s] the person's medical problem.  If there was some medical problems they would have let me know.  So, I did not think it was relevant since he was not seeing this doctor on a regular basis and he was not in a psychiatric, under psychiatric care or getting psychiatric treatment or taking anti-psychotic medication or any type of narcotics, so I didn't think that was relevant.

20

(*Id.* at 37-38.)

Second, Defendants' argument ignores the guidelines for adjudicators set out in the *Adjudicator's Field Manual*. There, the adjudicator is reminded that he or she "is not a physician and should not be placed in the position of making a medical determination." (Defs.' Ex. A.1, *Field Manual* at 6, ¶ (5)(D)(2).) The adjudicator is specifically instructed not to "[r]equire an applicant's medical records solely to question whether there was a proper basis for the medical professional's diagnosis." (*Id.*)

If, as Defendants urge, Petitioner's application should be denied because of "credible doubts" about his N-648 or its supporting certification, the *Field Manual* further instructs that the adjudicator "must explain the reasons why the credible doubts and deficiencies outweigh any favorable medical evidence submitted on the applicant's behalf." (*Id.* at 10, ¶ (5)(E)(7).) Defendants have not persuaded the Court that, as a matter of law, credible doubts outweigh Dr. Van Horn's favorable medical evidence submitted on Petitioner's behalf.

Finally, Defendants argue that, because Dr. Van Horn failed to use a "proper" interpreter and failed to obtain Petitioner's medical records from Dr. Mousla, she should have qualified her diagnosis; and the failure to do so, renders her diagnostic techniques medically unacceptable and precludes her from attesting to the origin and duration of Petitioner's mild mental retardation. As discussed above, Defendants have not established, as a matter of law, that Dr. Van Horn failed to use a "proper" interpreter or failed to obtain all records necessary for her diagnosis. Accordingly, these final arguments fail to advance Defendants' position that they are entitled to judgment as a matter of law. Viewing the

21

evidence in the light most favorable to Petitioner, this Court is not persuaded that Petitioner's naturalization application must be denied.

**2.  Additional Eligibility Requirement**

Defendants also argue that, even if this Court finds that Petitioner's Form N-658 is acceptable and he is found exempt from the English, U.S. history, and civics requirements for naturalization, Petitioner cannot demonstrate that he is attached to the principles of the U.S. Constitution, is able to understand the oath of allegiance required for citizenship, or has obtained a waiver from the Attorney General as permitted under 8 U.S.C. § 1448(a).[3] Although he has not yet done so, Petitioner may request a waiver "any time up until the administration of the oath ceremony."  Daniel Levy, *U.S. Citizenship and Naturalization Handbook*, § 7:103 (West 2002).  Accordingly, a question of fact exists whether Petitioner will obtain a waiver from the Attorney General and satisfy this additional naturalization requirement.

**IV.  Conclusion**

For the above-stated reasons, Defendants' motion for summary judgment is DENIED.

s/Nancy G. Edmunds
Nancy G. Edmunds
United States District Judge

Dated:  January 19, 2010

---

[3]Section 1448(a) provides that "[t]he Attorney General may waive the taking of the oath by a person if in the opinion of the Attorney General the person is unable to understand, or to communicate an understanding of, its meaning because of a physical or developmental disability or mental impairment."  8 U.S.C. § 1448(a).

I hereby certify that a copy of the foregoing document was served upon counsel of record on January 19, 2010, by electronic and/or ordinary mail.

s/Carol A. Hemeyer
Case Manager